# Exhibit G

to Movant's Motion to Quash

Page 1

1                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA

2                CASE NO.  1:20-CV-30961-KMW

3

4

5     SILVA HARAPETI, and other
      similarly situated individuals,

6

                 Plaintiff,

7

      vs.

8

      CBS TELEVISION STATIONS, INC.,

9     and CBS BROADCASTING, INC.,

10               Defendants.
      _____/

11

12                 Zoom Virtual Deposition
             Tuesday, 10:00 a.m. to 1:37 p.m. [CDT]

13                      July 6, 2021

14

15        DEPOSITION OF ELIZABETH MARY ROLDAN

16

17

18

19        Taken on behalf of the Plaintiff before

20    Nancy Gilbert, FPR, NCRA-certified stenographic

21    reporter, RPR, RMR, RDR, CRR, and Notary Public in

22    and for the State of Florida at Large, pursuant to

23    Notice of Taking Deposition and Supreme Court of

24    Florida Administrative Orders re: remote Notary

25    swearing of witnesses.)

```
                                                    Page 2
 1   APPEARANCES (All Appearing Remotely):
 2
 3   ATTORNEYS FOR PLAINTIFF
     SILVA HARAPETI
 4
 5       PETER M. HOOGERWOERD, ESQUIRE
         REMER & GEORGES-PIERRE, PLLC
 6       Suite 2200
         44 West Flagler Street
 7       Miami, Florida  33130
         (305) 416-5000
 8       pmh@rgpattorneys.com
 9
10   ATTORNEYS FOR DEFENDANTS
     CBS Television Stations, Inc. and
11   CBS Broadcasting, Inc.
12
13       BLAIR J. ROBINSON, ESQUIRE
         BAKER & McKENZIE LLP
14       452 Fifth Avenue
         New York, New York  10018
15       (212) 626-4100
         blair.robinson@bakermckenzie.com
16
         BENJAMIN C. DAVIS, ESQUIRE
17       BAKER & McKENZIE LLP
         Sabadell Financial Center, Suite 1700
18       1111 Brickell Avenue
         Miami, Florida  33131
19       (305) 789-8900
         benjamin.davis@bakermckenzie
20       (Present in conference room with witness)
21
22   ALSO PRESENT:
23       SILVA HARAPETI
24       MICHELLE VACHRIS, ESQUIRE
         In-House Counsel
25       CBS Broadcasting, Inc.
```

Page 3

1                            INDEX

2

  WITNESS                                    PAGE

3

4  ELIZABETH MARY ROLDAN

5     Direct Examination by Mr. Hoogerwoerd        7

6     Cross-Examination by Mr. Robinson           97

7     Redirect Examination by Mr. Hoogerwoerd     98

8     Certificate of Oath of Witness             100

9     Reporter's Deposition Certificate          101

10    Letter to Witness Re: Reading              103

11    Witness Signature Page                     104

12    Errata Sheet                               105

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Thereupon:

2          (The witness is appearing from her office

3  location in Houston, Texas, along with Mr. Benjamin

4  Davis, and agreed to being sworn by Florida Notary.)

5          CERTIFIED REPORTER:  Good morning.  I am

6      Nancy Gilbert, the court reporter.

7          Pursuant to the current Florida Supreme

8      Court Administrative Order regarding remote

9      swearing in of witnesses, the parties will

10     stipulate that the court reporter may swear in

11     the witness via the Zoom virtual deposition,

12     and that the witness has verified her identity

13     as Elizabeth Roldan by displaying her

14     photographic identification for the Notary

15     Public, her State of Florida driver's license.

16         Starting with the noticing counsel,

17     would the attorneys please state your name and

18     so stipulate, and then I will swear in the

19     witness.

20         MR. HOOGERWOERD:  Peter Hoogerwoerd for

21     plaintiff, Silva Harapeti.  So stipulated.

22         MR. ROBINSON:  Blair Robinson for the

23     defendant.  And I'm joined by my client,

24     Michelle Vachris, from CBS.

25         CERTIFIED REPORTER:  Ms. Roldan, would

1      you please raise your right hand.

2          Do you solemnly swear the testimony you

3      are about to give in this case will be the

4      truth, the whole truth, and nothing but the

5      truth?

6          THE WITNESS:  I do.

7          CERTIFIED REPORTER:  Thank you.

8          MR. ROBINSON:  And, Peter, one quick

9      clarifying question.

10         We're not on -- we're not doing video,

11     right?  I just wanted to confirm.

12         MR. HOOGERWOERD:  No.

13         MR. ROBINSON:  Okay.  Thank you.

14         MR. HOOGERWOERD:  Do you want me to do a

15     video?

16         MR. ROBINSON:  No.  It wasn't noticed

17     for video, but I never can tell on Zoom, so I

18     just wanted to make sure.

19         MR. HOOGERWOERD:  Right.  Yeah.  Okay.

20     No video for today.

21  Thereupon:

22              ELIZABETH MARY ROLDAN

23  was called as a witness and, having been first duly

24  sworn and responding, "I do," was examined and

25  testified as follows:

1                    DIRECT EXAMINATION

2    BY MR. HOOGERWOERD:

3         Q.    Good morning, Ms. Roldan.  I'm Peter

4    Hoogerwoerd.  I represent Silva Harapeti in a lawsuit

5    against CBS Television stations.

6               How are you today?

7         A.    I'm okay.  Thank you.

8         Q.    Thank you for being here.

9               I know we had some planning issues to get

10   your deposition scheduled, so I appreciate you being

11   here today.

12              Have you ever had your deposition taken

13   before, ma'am?

14        A.    No, sir.

15        Q.    All right.  So there are some ground rules

16   here because we have a court reporter here today.

17   She's supposed to take everything that we say down.

18   Because we're conducting this proceeding remotely,

19   over Zoom, even more so do we need to avoid speaking

20   over each other.

21              So please wait for me to finish my

22   question, my sentence, and I'll wait for you to

23   finish your answer.  In that way, it's easier for us

24   to get a clear record.  Okay?

25        A.    (Nodding head)

1      A.      Robert Springer, the general manager.

2      Q.      Is KHOU affiliated with CBS Television in

3  any fashion?

4      A.      It's an affiliate of CBS.

5      Q.      What does that mean?

6      A.      It runs CBS Television programming.

7      Q.      So previously to your role at KHOU, were

8  you employed by CBS Television Stations?

9      A.      Yes, I was.

10     Q.      Where were you employed?

11     A.      WFOR.

12     Q.      How long did you hold that position?

13     A.      I held two positions while at WFOR.  So,

14  which one?

15     Q.      I'm sorry.  Yeah, that's me trying to get

16  through this faster than I need to.

17             What was your position or your positions

18  with WFOR?

19     A.      I held two.  I began my tenure there as

20  the executive producer of special projects.  And my

21  second position was news director.

22     Q.      When did you hold the position of news

23  director?

24     A.      From November of 2011 until December of

25  2020.

1      Q.    And can you just describe for me what your

2  job duties were as news director from November of

3  2011 to December of 2020?

4      A.    I was the manager in charge of the news

5  department, department head in charge of all of the

6  journalism that was coming out of the newsroom, and

7  in general, its people.

8      Q.    And you held that position until December

9  of 2020?

10     A.    Yes, sir.

11     Q.    Why did you leave?

12     A.    I got a new opportunity at KHOU.

13     Q.    Were you terminated?

14     A.    No, sir.

15     Q.    Did you resign?

16     A.    Yes, I did.

17     Q.    Was there any agreement that you were

18 required to sign as part of that termination or

19 separation?

20     A.    None.

21     Q.    There was no severance?

22     A.    Severance?  No, I resigned.

23     Q.    Severance payments.

24           When did you start looking for your new

25 work at KHOU?

1          A.     I don't know that I was actually looking.

2     I think it fell into my lap.  Sometime in 2020.

3          Q.     When you say the position at KHOU fell

4     into your lap in 2020, what does that mean?

5          A.     It means that I wasn't actively searching

6     for a job.  I happened to notice that they were

7     looking for a news director in Houston, much by

8     happenstance.

9          Q.     When you say "happenstance," did somebody

10    tell you KHOU was looking for a news director?

11         A.     No, I happened to see a post.

12         Q.     Where did you see the post?

13         A.     On LinkedIn.

14         Q.     But you were not actively looking at the

15    time?

16         A.     No, sir.

17         Q.     So your testimony prior, you say that

18    you're the manager in charge of the news department

19    at WFOR and you were responsible for news and, in

20    general, people.

21         A.     (Nodding head)

22         Q.     Can you unpackage that for me a little

23    bit?  When you say that you're the manager of the

24    news department, what are your job duties?  Or what

25    were your job duties from 2011 until 2020?  Did they

1   employment with WFOR?

2       A.    No, I don't recall.

3       Q.    Did you ever have any conversations with

4   David Friend regarding recruiting talent for WFOR

5   during your employment with WFOR?

6       A.    Any type of talent?

7       Q.    Do you understand my question?

8             MR. ROBINSON:  Yes, I think she asked

9       you a question back.

10  BY MR. HOOGERWOERD:

11      Q.    All right.

12            MR. ROBINSON:  I think she was seeking

13      clarification, Peter, from you.

14            THE WITNESS:  (Nodding head)

15  BY MR. HOOGERWOERD:

16      Q.    Well, tell me what you mean by "any kind

17  of talent."  Why is that a question?

18      A.    There are different jobs.  There is

19  reporting and there is anchoring.  So I would like to

20  know which one you are referencing specifically so I

21  can answer properly.

22      Q.    All right.  Well, my question was

23  generally.  Did you ever speak to David Friend about

24  recruiting talent for WFOR-TV?

25            MR. ROBINSON:  Peter, she has asked you

1      a clarifying question.

2              MR. HOOGERWOERD:  And I think my

3          question is perfectly clear.

4              MR. ROBINSON:  I understand that you

5          don't want to answer, but the witness sought

6          clarification.  As you instructed her in the

7          beginning, you said, "If you don't understand

8          my question and you need clarification, you

9          can seek it."  That's all she has done.

10     BY MR. HOOGERWOERD:

11         Q.    Generally speaking, did you ever speak to

12     David Friend about recruiting talent for WFOR-TV?

13             MR. ROBINSON:  You can answer, Liz, in

14         any way you would like.

15             THE WITNESS:  Thank you.

16             Generally speaking, yes.

17     BY MR. HOOGERWOERD:

18         Q.    Next question.  Under what circumstances

19     did you speak with David Friend about recruiting

20     talent for WFOR-TV?

21         A.    I would speak specifically with David

22     about recruiting anchors for WFOR.

23         Q.    Other than anchors, did you ever speak

24     with David Friend about recruiting any other kind of

25     talent for WFOR?

1      A.      Executive producers, yes.

2      Q.      Anything else?  Any other category of

3  employee, or worker, reporter, that you spoke to

4  David Friend about in terms of recruiting talent for

5  WFOR-TV?

6      A.      On occasion, reporters.

7      Q.      Under what circumstances would you speak

8  to David Friend about recruiting reporters for

9  WFOR-TV?

10     A.      If there was someone within the

11 CBS-owned-and-operated group that was looking for

12 movement that we wanted to review tapes on.  "Tapes"

13 being their stories.

14     Q.      Ms. Roldan, you previously testified that

15 if somebody wanted to apply for a full-time position,

16 anybody could apply for a full-time position as a

17 reporter, right?

18     A.      (Nodding head)

19     Q.      And you're shaking your head.  You have to

20 say yes or no.

21     A.      I was waiting for the question.  Yes.

22     Q.      So the review of tapes for, I guess,

23 another reporter within the O & O system, would those

24 people have applied already for the position or would

25 you be actively looking to recruit those individuals

Page 42

1    to work at WFOR?

2         A.    It could vary.  But, ultimately, they

3    would --  It could vary.

4         Q.    And "ultimately, they could" what?

5         A.    Anybody could apply.

6         Q.    At what point would the application be

7    requested from the potential recruit that you would

8    be discussing with David Friend for WFOR?  Object to

9    form.  Assumes facts not in evidence.  Misstates the

10   testimony.

11            You can answer, if you can.

12            THE WITNESS:  Can you repeat the

13       question, please?

14   BY MR. HOOGERWOERD:

15        Q.    Sure.

16            Like, so let's say that you are looking to

17   recruit a reporter from some other O & O or

18   owned-and-operated station and you reviewed the tapes

19   for their stories, does the application come at the

20   beginning or at the end of that process?

21        A.    It could come at any time.

22        Q.    Could the application come after the

23   interview of the potential candidate?

24            MR. ROBINSON:  Object to form.  Calls

25       for speculation.

1           You can answer if you can, Liz.

2           THE WITNESS:  Repeat the question again,

3       sir.  I'm sorry.

4   BY MR. HOOGERWOERD:

5       Q.    Sure.

6           Let's say that you found somebody that you

7   like, and you reviewed their tapes and you discussed

8   it with David Friend, could the application for the

9   full-time position with WFOR-TV come at the end of

10  that process?

11      A.    The process is lengthy.  It's not one

12  interview.  The application process can come, the

13  actual application can come at any time during that

14  process.

15      Q.    Did you discuss criteria for news

16  reporters that you would be interested in

17  interviewing with David Friend?

18          MR. ROBINSON:  At any point in time?

19          MR. HOOGERWOERD:  During her tenure with

20      WFOR.

21          THE WITNESS:  Did I --  Repeat that

22      again.  Did I discuss criteria?

23  BY MR. HOOGERWOERD:

24      Q.    Yes.  What kind of things would you be

25  looking for?

```
 1              MR. ROBINSON:  Well, that's a different
 2         question.  So which one do you want her to
 3         answer, Peter?
 4              MR. HOOGERWOERD:  She has asked me to
 5         clarify, and I think I'm clarifying
 6         "criteria."
 7              MR. ROBINSON:  So now you're clarifying.
 8              MR. HOOGERWOERD:  Yes.  So now let me
 9         try this a third time.
10              It's not as easy as it looks,
11         Ms. Roldan.  I'm sorry.
12    BY MR. HOOGERWOERD:
13         Q.   Did you discuss the criteria for the news
14    reporters that you were interested in with
15    David Friend, news reporters to come to WFOR?  Did
16    you discuss any kind of criteria with him, what you
17    were looking for?
18         A.   Over the course of my tenure?
19         Q.   Yes.
20         A.   Yes.  I'm sure I must have.
21         Q.   Do you remember what that criteria was
22    that you discussed with David Friend for news
23    reporters to come to WFOR?
24         A.   Specifically, probably shift, what shift
25    they were required to work.
```

1  Q. Anything else?

2  A. Probably their experience.

3  Q. Anything else?

4  A. Not that I can recall.

5  Q. Did you ever receive a directive from

6 anybody at WFOR or from CBS Television stations, a

7 directive that you needed to control the costs of

8 your news department?

9  A. A directive?  Can you clarify what you

10 mean by that?

11  Q. Yes.  Somebody who is in a position of

12 authority over you telling you that you needed to

13 control the costs for your department.

14  A. Not that I can recall.

15  Q. So when you are hiring a news reporter

16 full-time, is there a difference between hiring a

17 news reporter full-time as compared to a per diem

18 news reporter working for WFOR?

19   MR. ROBINSON:  Object to form.  Vague as

20  to "difference."

21   You can answer, if you can, Liz.

22   THE WITNESS:  A difference in what way?

23 BY MR. HOOGERWOERD:

24  Q. What their job responsibilities are; what

25 their pay is; what they're supposed to do.

1       Q.    Would you have corresponded with anybody

2   with regard to promoting Lauren Pastrana from

3   per diem to full-time reporter at WFOR?

4           MR. ROBINSON:  Object to form.  Calls

5       for speculation.

6           You can answer if you can.

7           THE WITNESS:  There was paperwork that

8       was required, forms that had to be filled out.

9   BY MR. HOOGERWOERD:

10      Q.    Any e-mails?

11      A.    I can't say for sure.

12      Q.    What paperwork or forms would you have

13  required to be filled out to promote Lauren Pastrana

14  from a per diem to a full-time news reporter?

15      A.    I don't remember the exact forms, but

16  there were forms, paperwork, that you had to fill out

17  with a person's name, and whatnot.

18      Q.    Did you consult with David Friend on

19  promoting Lauren Pastrana?

20      A.    Not that I can recall.

21      Q.    You can't say one way or another?

22      A.    I -- I can say I can't remember.

23      Q.    Was Lauren Pastrana's experience one of

24  the criteria that you considered in promoting her

25  from per diem to full-time?

1    BY MR. HOOGERWOERD:

2         Q.    Do you think she is making it up?

3              MR. ROBINSON:  Object to the form.  You

4         can answer.

5              THE WITNESS:  I have no idea.

6    BY MR. HOOGERWOERD:

7         Q.    Was David Friend involved in your decision

8    to promote Oralia Ortega from per diem to full-time?

9         A.    Not that I can recall.

10        Q.    You don't know either way?

11        A.    Not that I can recall.

12        Q.    What about Ty Russell, was David Friend

13   involved with the decision to promote Ty Russell?

14        A.    Not that I can recall.

15        Q.    In your role as news director for WFOR-TV,

16   during your tenure there, you were responsible in

17   general for the content of the news?

18        A.    Overall.  I don't make the -- I didn't

19   make the decisions on a moment by moment.

20        Q.    Your assistant news director and editorial

21   staff would have assisted you with that --

22        A.    Primarily --

23        Q.    -- in terms of --

24        A.    Primarily the executive producers and the

25   assignment manager and the managing editor.

1          MR. ROBINSON:  Object to form.  Vague.

2      Calls for speculation.

3          You can answer.

4          THE WITNESS:  Through regular

5      conversation.  There was no formalized

6      process.

7  BY MR. HOOGERWOERD:

8      Q.   Was the decision to hire news reporters

9  for WFOR-TV on a per diem basis, was that something

10  that was directed to you by corporate on an O & O

11  level?

12          MR. ROBINSON:  Objection.  Vague.

13      Compound.  Calls for speculation.

14          You can answer, if you can.

15          THE WITNESS:  Can you --  I don't --

16          I don't understand the question.

17  BY MR. HOOGERWOERD:

18      Q.   Sure.  Why did the category of per diem

19  news reporters exist as WFOR?

20      A.   I can't say that I know exactly why.  But

21  it was an opportunity to get someone hired to fill an

22  open position.

23      Q.   And who created that position?

24          MR. ROBINSON:  At WFOR?

25

1  BY MR. HOOGERWOERD:

2      Q.    I mean, she only worked at WFOR for the

3  time period that we're talking about.  Right?

4            So when you worked at WFOR, who created

5  that position?

6      A.    Who created the existing per diem

7  position?

8      Q.    Correct.

9      A.    I'm not sure exactly who creates it.

10     Q.    Would that directive have come from upper

11 management at CBS Television Stations?

12           MR. ROBINSON:  Object to form.  Calls

13     for speculation.

14           You can answer.

15           THE WITNESS:  Not that I'm aware of.

16 BY MR. HOOGERWOERD:

17     Q.    You don't know one way or the other?

18     A.    I'm -- I'm not aware.  I don't --

19           I just don't know.

20     Q.    But you can say with certainty, whenever

21 there were a position to be filled at WFOR for a

22 per diem role, that directive would have come to you

23 from Adam Levy, correct?  Adam Levy.  I'm sorry.  I'm

24 mispronouncing his name.

25     A.    No, that's okay.

1          No, I -- I don't --

2          No, it would be the -- I would request if

3    I could fill a position.

4          And I would get --  So, as you say a

5    directive?  I would make a request, and he would give

6    me the answer.

7          Q.    Is that process also true for promotions

8    of per diem employees to full-time roles, such as

9    Lauren Pastrana, Oralia Ortega, and Ty Russell?

10         A.    Yes.

11         Q.    Did you request that from Adam Levy, and

12   he would either approve it or reject it?

13         A.    I'm sure he would.  Yes, that's --  Yes,

14   that's correct.

15         Q.    Would any other individuals be involved in

16   that process of promoting a per diem news reporter to

17   a full-time employee?

18         A.    Generally, the H.R. department at the

19   station and the controller of the station.

20         Q.    But the H.R. department and controller

21   wouldn't make those management decisions, right, it

22   would be --

23         A.    Right.

24         Q.    -- your station management that would?

25         A.    Correct.  But I think you asked if others

```
 1   were involved?
 2        Q.    Right.  So H.R. would be involved with the
 3   paperwork?
 4        A.    Yes.
 5        Q.    And the controller would be involved with
 6   perhaps rates of pay?
 7        A.    Correct.
 8        Q.    Who was the controller at the time that
 9   you worked for WFOR?
10        A.    His name is Carl Larson.
11              And there was -- I'm sorry.  There was a
12   gentleman prior to Carl, at the beginning of my time
13   at WFOR, named Randy Pringle.
14        Q.    At the time that you were there, who did
15   Carl Larson report to?
16        A.    I believe Adam Levy.
17        Q.    Did you ever refer to news reporters as
18   talking heads?
19        A.    I doubt it.  I don't believe so.
20        Q.    What involvement would David Friend have
21   with WFOR-TV promoting a news reporter from per diem
22   to full-time at WFOR?
23              MR. ROBINSON:  Object to form.  Calls
24        for speculation and assumes facts not in
25        evidence.  Also, asked and answered.
```

1          You can answer again, Liz.

2          THE WITNESS:  I think I would show a

3     reporter to David.  That's about it.

4  BY MR. HOOGERWOERD:

5     Q.    Did you show Lauren Pastrana to

6  David Friend?

7     A.    I can't recall for sure.

8     Q.    What about Oralia Ortega, did you show

9  Oralia Ortega to David Friend?

10    A.    I can't recall for sure.

11    Q.    What about Ty Russell, did you show

12 Ty Russell to David Friend?

13    A.    I can't recall for sure.

14    Q.    But, generally speaking, it's your

15 testimony here today that David Friend would be

16 involved in that hiring process?

17         MR. ROBINSON:  Objection.  Vague.

18    Compound.

19         You can answer.

20         THE WITNESS:  No.  My testimony would be

21    that I would show David the reporter.

22 BY MR. HOOGERWOERD:

23    Q.    Why would you show David the reporter?

24    A.    Because I wanted -- I wanted his opinion.

25    Q.    Why would you want David Friend's opinion

1    on a hiring or a promotion of a news reporter?

2            MR. ROBINSON:  Object to form.

3            Peter, that's not what she just said.

4        And now you're just twisting her words.

5            You can answer again.  You can answer

6        again, Liz, what you said before.

7            THE WITNESS:  What I said before is that

8        I would show a reporter to David.

9    BY MR. HOOGERWOERD:

10       Q.    And I asked you why, and you said you

11   wanted his opinion.  Why would you want his opinion?

12       A.    To get a second opinion.

13       Q.    So David Friend's opinion would matter to

14   you in making a hiring decision?

15       A.    It could.

16       Q.    And if David Friend told you to reject a

17   candidate for a full-time reporting position at WFOR,

18   would you take that advice and say:  I don't like

19   this reporter, don't hire them?

20            MR. ROBINSON:  Object to form.  Assumes

21       facts not in evidence.  Incomplete

22       hypothetical.

23            You can answer.

24            THE WITNESS:  It wouldn't be that

25       simple, no.

1  BY MR. HOOGERWOERD:

2      Q.    Explain to me that process.

3      A.    One specifically where David didn't like

4  the talent?

5      Q.    Well, you said that you would ask him for

6  and you would want his opinion as a second opinion.

7            I'm asking if he ever told you:  My

8  opinion is that you should not hire that news

9  reporter or you should not promote that news

10 reporter.  Would that foreclose you from hiring that

11 individual?

12     A.    No, it would not.  It would not.

13     Q.    Who is Nick Bourne?

14     A.    Nick Bourne was the assistant news

15 director at the station.

16     Q.    Did Nick Bourne report to you when he was

17 working there?

18     A.    Yes, sir.

19     Q.    Did Nick Bourne ever tell you that Silva

20 had complained to him about being assaulted during a

21 football game?

22     A.    Not that I can recall.

23     Q.    What e-mails did you review today in

24 preparing for your deposition?  And I don't want to

25 know about e-mails that were authored by or sent to

1      turn it over to you here in a second.

2              MR. ROBINSON:  Okay.

3              (Recess taken in the proceedings 1:31

4      p.m. to 1:35 p.m. [CDT], after which the following

5      proceedings were had:)

6              MR. HOOGERWOERD:  Okay.  Your turn,

7          Blair.

8              MR. ROBINSON:  Okay.  I only have a few.

9                    CROSS-EXAMINATION

10     BY MR. ROBINSON:

11         Q.   Ms. Roldan, do you have any knowledge as

12     to whether Peter Dunn was consulted on any employment

13     decision involving Silva Harapeti?

14         A.   No.

15         Q.   Do you have any knowledge as to whether

16     David Friend was consulted on any employment decision

17     involving Silva Harapeti?

18         A.   No.

19         Q.   Do you have any knowledge as to Peter Dunn

20     being involved in the hiring of per diem reporters at

21     WFOR?

22         A.   No.

23         Q.   Do you have any knowledge of David Friend

24     being involved in the hiring of any per diem

25     reporters at WFOR?

 1       A.    That, I --  I don't recall that, no.

 2       Q.    Do you have any knowledge of Peter Dunn

 3  being involved in decisions about what to pay

 4  per diem reporters or producers at WFOR?

 5       A.    No.

 6       Q.    Do you have any knowledge of David Friend

 7  being involved in decisions about what to pay

 8  per diem reporters or producers at WFOR?

 9       A.    No.

10            MR. ROBINSON:  Those are all the

11       questions that I have.

12            Peter, are we good, or do you have more?

13            MR. HOOGERWOERD:  Yeah.  I have just one

14       question.

15                  REDIRECT EXAMINATION

16  BY MR. HOOGERWOERD:

17       Q.    Ma'am, you testified earlier, right,

18  though, that you would consult with David Friend, you

19  would get a second opinion from him on hiring

20  decisions for full-time reporters at WFOR?

21       A.    Yes.  I would send him links.

22       Q.    Do you know why David Friend was fired?

23       A.    No, I don't.  I'm not even sure he has

24  been fired.

25       Q.    All right.  The same question for Peter

1    Dunn, do you know why he was separated from his

2    employment?

3          A.     No.

4                 MR. HOOGERWOERD:  All right.  Read or

5          waive?

6                 MR. ROBINSON:  We will read.

7                 MR. HOOGERWOERD:  I'll order a mini, and

8          I'll send you the two exhibits, Nancy.

9                 CERTIFIED REPORTER:  Mr. Robinson, do

10         you want a copy?

11                MR. ROBINSON:  Please.  And a rough.

12                CERTIFIED REPORTER:  A rough draft?

13                MR. ROBINSON:  Yes.

14                (Thereupon, the taking of the deposition

15   was concluded at 1:37 p.m.  Signature and

16   formalities were not waived.)

17

18

19

20

21

22

23

24

25